JOHNNY L. HOLLOWAY *v.* STATE OF MARYLAND

[No. 683, September Term, 1974.]

*Decided May 29, 1975.*

The cause was argued before THOMPSON and LOWE, JJ., and ROBERT F. SWEENEY, Chief Judge of the District Court of Maryland, specially assigned.

*Alfred J. O'Ferrall, III, Deputy Public Defender,* and *Victoria A. Salner, Assigned Public Defender,* with whom were *Alan H. Murrell, Public Defender,* and *Arnold M. Zerwitz, Assistant Public Defender,* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with

whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Joseph Murphy, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

SWEENEY, J., delivered the opinion of the Court.

The Appellant, Johnny L. Holloway, was convicted in the Criminal Court of Baltimore by a jury presided over by Judge Paul A. Dorf of unlawful possession of narcotics. He was sentenced to two years imprisonment under the jurisdiction of the Department of Correction.

The prosecution and conviction of Holloway grew out of a lengthy investigation into the theft of a large quantity of heroin from the property room of the Baltimore City Police Department. At the time of his indictment and arrest, Holloway was a member of the Baltimore City Police Department, and during the year 1972 he was assigned to the Special Tactical Operations Patrol (STOP), a unit which included illegal traffic in narcotics in its area of responsibility.

On February 24, 1972, Holloway and one or more other members of his unit made several narcotics arrests during the course of which they seized substantial quantities of heroin. According to normal departmental procedures, this contraband was stored in the Police Department property room pending the trial of the arrested persons. At some time during the period between February 24, 1972 and January 11, 1973, a large quantity of the heroin was found to be missing from the property room.

Holloway was charged in a multi-count indictment with unlawful possession of narcotics and larceny of the heroin, and was brought to trial on March 18, 1973. He was found guilty of unlawful possession, the jury being unable to reach a verdict on the other counts.

Holloway now attacks his conviction on four grounds, two of which can be dealt with summarily. The evidence revealed that the narcotics in question were seized by Holloway and other officers incident to the arrest of three individuals,

Donald McNeal, Robert Crawley, and Louis Jefferson. Two separate seizures were made, but all of the heroin appears to have been contained in small glassine bags and all of it was taken to the "tactical station" where it was field tested, examined, initialed, and counted by each individual bag. The State introduced two laboratory analysis reports signed by Holloway as the reporting and/or arresting officer. These reports, State's Exhibits 4 and 5, indicated that 1248 bags of heroin were seized in the arrest of McNeal and Crawley and 5389 bags were seized in the arrest of Jefferson.

At trial, Holloway's counsel made repeated attacks on the accuracy of the count of the seized heroin at the time it was received into the property room, in an attempt to show that the count was erroneous, and that the State, therefore, could not prove that any of the substance had been stolen from the property room.

To testify about the manner in which the count was conducted, the State produced John Lewis, a detective assigned to the STOP squad, who had participated in the arrests of Crawley, McNeal, and Jefferson. Lewis testified that he had assisted in counting the seized drugs and that he had personally counted all 1248 bags seized in the McNeal and Crawley arrests. He testified further that he had participated in the counting of the bags seized in the Jefferson arrest and that he was present throughout the entire counting process and when the final tally was made. During Lewis' testimony, he was permitted to refer to State's Exhibits 4 and 5, in order to refresh his recollection. The Appellant urges that it was improper for him to have been permitted to do this, as he was not the police department official who had actually prepared those documents.

We find no merit in this contention. It is clear that Lewis was present throughout the entire counting process and was present when the final tally was made. His testimony was not hearsay, but proceeded from his own personal knowledge, and was clearly admissible. His reference to the State's exhibits in order to refresh his recollection did not taint his testimony.

Appellant next attacks the refusal of the trial judge to permit him to cross-examine Detective Roger Nolan, another State's witness, on alleged inconsistencies between his testimony at the Holloway trial and his prior testimony in the United States District Court for the District of Maryland, at the trial of Robert Crawley, one of the persons arrested in the raids on February 24th. Nolan was also among the officers who participated in the heroin count on February 24th and he testified at considerable length at the Holloway trial about the manner in which that count was conducted. On cross-examination, Nolan admitted that he had told another police officer that ". . . the easiest thing for [him] to believe [was that] there had been a miscount on February 24, 1972, that is why there is a shortage." Appellant's counsel then sought to cross-examine him further concerning testimony he had given in the federal trial of Crawley. The trial judge refused to permit cross-examination on this topic. The record discloses that at a bench conference, Appellant's counsel read the portions of Nolan's testimony in the federal proceedings about which he wanted to interrogate Nolan. That excerpt of testimony revealed that Nolan had, in that trial, cast doubts on the accuracy of the heroin count of February 24, 1972. Therefore, his testimony in the federal proceeding was consistent with and not contradictory to his testimony at the Holloway trial, and we can find no abuse of discretion on the part of the trial judge in refusing Appellant's counsel the right to pursue the matter; nor do we find any prejudice resulting to the Appellant from that refusal.

We also find that the trial judge did not err in refusing to allow Holloway's counsel to cross-examine Nolan as to any changes made in police department procedures for handling narcotic substances subsequent to the time when the shortage in question was discovered. Judge Dorf, in our view, correctly ruled that any departmental procedures occurring after Holloway's arrest were not relevant to the matter before him.

Holloway's other contentions, however, present us with questions of a much more difficult nature. He alleges that

the trial court erred in admitting into evidence two oral statements and one written statement allegedly made by him to his superiors during his interrogation about the missing heroin. That error was so prejudicial, he states, that his conviction cannot be permitted to stand.

Prior to the trial on the merits, a hearing was held out of the presence of the jury on the Appellant's motion to suppress the three statements. The motion was denied and the statements were subsequently introduced at the trial.

It appears that during the course of the investigation into the missing heroin, departmental officials found that Holloway's signature was contained in the property room log under date of November 27, 1972, indicating that he had removed the seized heroin from the property room on that date. In the first of the three statements in question, Holloway denied that he had ever been in possession of any of the heroin since it was seized and placed in the property room on February 24, 1972. That statement was given orally by Holloway to Lt. Leon N. Tomlin, the officer in charge of the investigation, on January 12, 1973. The next day, January 13th, Holloway gave a second oral statement to Lt. Tomlin. In this statement, he admitted that the signature on the log was his, and admitted that he had removed the drugs from the property room, but claimed that he had merely taken the drugs to his automobile, counted them, and returned them intact on the same day. In his third statement, made in writing on a Police Department form on January 14th, he again admitted having signed the log and removing the drugs, and again claimed to have returned all of the heroin to the property room.

These three statements, of course, do not amount to an admission of guilt, but the second and third statements are in such flat contradiction to the first statement that we believe it safe to assume that they were given great weight by the jury as reflecting on Holloway's credibility. At the very least, the statements were sufficient to prove to the jury that Holloway had had the contraband in his possession and had had the opportunity to appropriate some portion of the narcotics to his own use and purposes. If the

contradictory statements of Holloway were improperly admitted into evidence, it is clear that he was severely prejudiced thereby, and we would reverse his conviction.

In the pre-trial hearing on the Motion to Suppress, Holloway attacked the admissibility of all three statements, claiming (1) that he had not been given his *Miranda* rights, and (2) that even if he had been given his *Miranda* rights, his statements were inadmissible as having been coerced, because of a Police Department policy stipulating that if a member of the department refused to give a statement to a superior officer when ordered or requested to do so, he would face disciplinary action and possible termination of his employment. The very existence of such a policy, Holloway asserted, amounted to coercion. Judge Dorf denied the Appellant's motion, and we believe that it was erroneous for him to have done so, although we believe he correctly found from all of the evidence that Holloway had been given his *Miranda* rights prior to any interrogation and several times subsequent thereto. There was ample testimony from Lt. Tomlin and other Police Department officials to that effect, and Judge Dorf was entitled to believe that testimony and to disbelieve Holloway's testimony that he had not been advised of those rights.

His error, in our view, lay in refusing to find that the statements were involuntary as a matter of law, because of the existence of a departmental policy of disciplining those who refused to give such statements. The Appellant correctly urges that this situation is controlled by the decision of the Supreme Court in *Garrity v. New Jersey*, 385 U. S. 493, 17 L.Ed.2d 562, 87 S. Ct. 616, in which case there was a set of facts strikingly similar to those now at hand. The Attorney General of New Jersey was directed by the Supreme Court of that state to investigate alleged irregularities in the handling of traffic tickets, and in the course of that investigation the Attorney General sought to interrogate police officers in certain New Jersey boroughs. Before the interrogation, each officer was warned that anything he said might be used against him in a criminal proceeding, and that he had the privilege of refusing to

answer, if his response would tend to incriminate him. Each officer was also advised that if he did refuse to answer, he would be subject to removal from office under the provisions of a New Jersey statute which provided that any public employee refusing to answer questions in a criminal investigation into his conduct would forfeit his employment and be forever thereafter debarred from public employment. The New Jersey officers answered the questions and some of them were subsequently convicted at trials at which their statements were admitted into evidence. On appeal, they claimed that those statements were coerced by the effects of the forfeiture statute. The New Jersey Supreme Court affirmed the convictions, holding that the statements were voluntary; but the Supreme Court granted certiorari and reversed the convictions, holding that the threat of removal from public office for insisting on the privilege against self-incrimination rendered the resulting statements involuntary and, therefore, inadmissible.

In the instant case, the State urged before Judge Dorf and urges before us that *Garrity* is inapplicable, as there is no Maryland forfeiture statute comparable to that then in effect in New Jersey. We are not persuaded by that argument, as Lt. Tomlin, the State's witness, testified candidly that there was a written Police Department policy to that same effect. Whether the policy be statutory or by regulation the result would be the same under *Garrity*, for the effect upon the officer would most surely be the same. If, therefore, the question of the admissibility of Holloway's three statements were properly before us, we would find *Garrity* applicable to them, would hold them inadmissible, and would reverse the conviction. But for the reasons which follow, we do not find the question properly before us.

Notwithstanding his vigorous objections to the admission of the statements at the pre-trial hearing, Holloway did not object at trial when the first two of those statements were offered into evidence. A close reading of the record clearly reveals that the only objection made by Holloway to the admission of any of his statements came when the State sought to have Lt. Tomlin produce Holloway's written

statement of January 14, 1973. The refusal of the trial judge to sustain that objection was erroneous under *Garrity*, but that error was rendered harmless to the Appellant by virtue of the fact that the contents of that written statement were identical to the contents of his oral statement of January 13th, about which Lt. Tomlin had just testified without objection.

Each of the Appellant's three statements was brief, and because of their importance in this case, we think it appropriate to set out in full Lt. Tomlin's testimony concerning each of them. As to the first statement, Lt. Tomlin testified that on January 12th he had the following colloquy with Holloway:

> "A Question: Was the evidence ever put together for photographing? Answer: The bundles were put together for photographing of the complete seizure. Question: Did you remove the evidence from the evidence control unit on 27 November, 1972? Answer: No. Question: Did you have possession of the drugs on either the 10th or 11th of January, 1973? Answer: I didn't touch them at all. Question: Have you heard information to the effect that Uncle Bernie Miller was to substitute quinine for heroin in this case?
>
> MR. W. MURPHY: Objection to any hearsay that is a part of the statement. I think what Mr. Holloway answered in terms of relevant portions of this case, yes, but hearsay evidence, no.
>
> THE COURT: I will overrule the objection as far as the statement.
>
> THE WITNESS: Answer: Yes. I read a 95 written by Sergeant Gillespie but I am not sure.
>
> MR. J. MURPHY:
>
> Q Were there any other questions and answers at that particular time?
>
> A. Yes.
>
> Q. All right. What were they?

A. Question: Did you accompany Sergeant Gillispie to the property room about two or three weeks ago when he examined the evidence in these cases? Answer: No. Question: On Wednesday, 10 of January, 1973, where were the drugs during the lunch period? Answer: In the State's Attorney's office safe. Question: Did you know any of the jail guards in the court? Answer: Only by their faces".

No objection was made to the introduction of this statement per se, the only objection being to an unimportant portion of that statement on the ground that it was hearsay, which objection was properly overruled by the trial judge.

Lt. Tomlin's testimony about the second oral statement of Holloway was as follows:

"Q What were the questions then and what were the answers at this particular time?

A Question: Were you present on the McNeal arrest? Answer: Yes, sir. Question: Did you count the drugs seized on the McNeal arrest? Answer: I counted some, not all. Question: Was the evidence sealed from the McNeal arrest during the investigation and the raid on Hilton Street? Answer: I don't know, I don't think so. Question: Were you present on the Hilton Street raid? Answer: Yes. Question: Did you participate in the counting of this evidence? Answer: I don't remember, I think I counted some of it. Question: Did you field test any of the evidence? Answer: Yes, one bag mentioned for the warrant. Question: Both seizures of evidence ever displayed together? Answer: I don't know. I know two packs from the Hilton Street case were together. Question: Do you recall anyone from the crime lab responding to the tactical division? Answer: I remember the photographer but I don't recall any pictures. Question: Who delivered the evidence to the chemist? Answer: I took it to the chemist. Question: Did you take the evidence out of the evidence

control room on 27 November, 1972? Answer: I picked it up. And I picked it up to make sure it had not been tampered with. Question: Where did you take it? Answer: Out to my car. Question: What did you do with it? Answer: I brought it back in when I saw it hadn't been opened. Question: With whom did you meet with the evidence when you heard it was tampered with? Answer: By myself, only to the car. Question: Did you go to the doctor on 12 January, 1973?

MR. W. MURPHY: Objection, Your Honor. This part of it is irrelevant in the case.

MR. J. MURPHY: I think we can tie up the relevancy.

THE COURT: I don't know whether it is. You say it's relevant. I'll let it in subject to you proving it is relevant.

MR. J. MURPHY: Thank you.

A 'Question: Did you go to the doctor on 12 January, 1973? Answer: No, I was going to the dentist to get my teeth cleaned. Question: Did you have an appointment? Answer: No. Question: What is the name of your dentist? Answer: I don't know, his office is in the Alameda Shopping Center. Question: When you picked up the evidence on 27 November, 1972, what did you do with it? Answer: I counted the 29 bags but I did not open the other two.'

Q. Were there any further questions and answers at that particular time?

A. No.

Q With reference to the question that you asked dealing with the doctor's appointment, why did you ask that particular question?

MR. W. MURPHY: Objection.

THE COURT: I'll sustain the objection at this time".

It is obvious that the objection of Appellant's counsel was not to the introduction of all or the major part of the testimony concerning this statement, but only to the portion dealing with his visit to a doctor on January 12, 1973. Judge Dorf sustained that objection. There was no follow-up to it at that time and it does not change our view that Holloway waived objection to the introduction of both of these statements by not making his objection known before the jury.

The introduction into evidence of a statement obtained in violation of a defendant's constitutional rights is obviously a matter of grave importance, but the law is well settled that the issue must have been raised in the trial court in order to have it considered on appeal. Even a constitutional right may be waived and such a waiver occurred in this case when Appellant failed to object to Lt. Tomlin's testimony concerning his first two statements. We have repeatedly held that even though the trial court determines preliminarily that a statement is admissible, objection must be made when it is offered before the jury in order to preserve the question of its admissibility on appeal. Md. Rules 1085 and 522 d 2. *Ragler v. State,* 18 Md. App. 671, 308 A. 2d 401 (1973); *Davidson v. State,* 18 Md. App. 61, 305 A. 2d 474 (1973); *Smith v. State,* 16 Md. App. 317, 295 A. 2d 802 (1972); *Jones v. State,* 9 Md. App. 455, 265 A. 2d 271 (1970); *Hall v. State,* 6 Md. App. 356, 251 A. 2d 219 (1969).

Lt. Tomlin's testimony concerning Holloway's third statement, the written one of January 14th, was as follows:

Q. Examining the exhibit can you tell the ladies and gentlemen of the jury what the statement said with reference to the removal of the drugs from the property room on November 27th, 1972?

A. Yes, I'll have to find it. The first initial part led up to it. It's titled —

Q Read the document and make sure it's loud enough.

A It's titled to me, Lt. Leon Tomlin, 14 January, 1973. I respectfully report that I received information from Dixon on Friday, the week-end after Thanksgiving that I should watch myself. Dixon stated that he thinks my buddy was making a deal with the drugs that I had recovered from the raid we had up on Hilton Street. Dixon stated that Joe Perry had asked him to loan him $8,000, that he had a thing and he would give it back in two or three months. He further stated Joe was bragging about he was going to order him a superfly Cad, period. So we both agree that he must be making some type of deal because at the time he was begging people to feed him every day. Dixon stated that Joe Perry and my buddy was talking a lot at the Lorman house the other night, meaning some time before that night, Dixon and I was very good friends that way. When he told me that I believed a deal was being made. On either Monday the 27th of November, 1972 I went to the crime control unit to get the evidence out and check it. I took the evidence out to my car, parked over by the Central District where I counted it by the bag. I don't recall the exact number but it was more than 5,000 bags. After counting the drugs I went into the Central District, got a stapler, sealed the package and took a piece of string and tied it around the drugs so I would know if anyone tampered with the package before Bobby Crawley case came up."

Objections were properly and timely made to Lt. Tomlin's testimony about this statement of the Appellant, and, as we have noted earlier, we think that the trial judge erred in admitting it into evidence. This statement, however, contained nothing prejudicial to Holloway that was not contained in the second statement, which was admitted without objection. Indeed, the third statement contained

matter that was exculpatory to Holloway, as it contains some more detailed reasons for his actions in removing the heroin from the property room on November 27, 1972. We can find no way in which Holloway was damaged by the trial judge's refusal to exclude the third statement from evidence, for the exclusion of that statement would not have freed him from the entanglements of the contradictions so apparent from the comparison of his first and second statements. The error was harmless error, insufficient to lead us to reverse the conviction.

We recognize that error in admitting into evidence a statement involuntarily made or coerced is an error of constitutional dimension, and before such an error can be declared harmless, we must satisfy ourselves that it was so beyond a reasonable doubt. In *Harrington v. California*, 395 U. S. 250, 23 L.Ed.2d 284, 89 S. Ct. 1726 (1969), citing *Chapman v. California*, 386 U. S. 18, 17 L.Ed.2d 705, 87 S. Ct. 824 (1967), the Supreme Court said that ". . . although 'there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error' not all 'trial errors which violate the Constitution automatically call for reversal.' "

The Court went on to say that whether the error was harmless beyond a reasonable doubt is to be based on an independent reading of the record and what seems to have been the probable impact of the tainted evidence on the minds of an average jury. In *Younie v. State*, 272 Md. 233, 246, 322 A. 2d 211 (1974), the Court of Appeals, in reversing a conviction where evidence was introduced showing the defendant refused to answer questions, said:

> "What is of importance, from an examination of the cases which discuss harmless error, is the realization that if the error goes to a substantial constitutional right (e.g. right to counsel — sixth amendment, right not to self-incriminate — fifth amendment) then unless the State can prove beyond a reasonable doubt, as the prosecution did in *Milton v. Wainwright*, 407 U. S. 371, 92 S. Ct.

2174, 22 L.Ed.2d 1 (1972) (where an invalid confession accompanied three valid ones and other substantial evidence of guilt), that a tainted confession *in no way influenced the verdict* such that the defendant would undoubtedly have been found guilty even if that evidence had been received, its employment will always be error. Conversely, if the State can show beyond a reasonable doubt that the violation was technical in nature, as well as that the erroneously admitted evidence was merely cumulative, and that there was other overwhelming and largely uncontroverted evidence properly before the trier of fact, then the error would be harmless. *Brown v. United States,* 411 U. S. 223, 93 S. Ct. 1565, 36 L.Ed.2d 142 (1973) (concerned with a *Bruton* violation). See also annotation to *Schneble v. Florida, supra,* contained in 31 L.Ed.2d 921."

The oral statements of Holloway were admitted into evidence because no objection to them was made when offered, and we are also satisfied beyond a reasonable doubt that the erroneous admission of the third statement was harmless to Holloway, that statement being merely cumulative to the statements previously admitted.

We believe from our review of the entire record that there was more than sufficient evidence properly presented to the jury on which they could base their verdict of guilty of illegal possession of narcotics. A police officer is not entitled to possess illegal drugs except when such possession occurs in the performance of his official duties. Holloway had no authority to remove the drugs in question from the property room on November 27, 1972, and, in fact, in his first statement to Lt. Tomlin he lied and denied having done so. Although in his second statement the Appellant denied ever having appropriated any of the heroin to his own use, the jury was entitled to believe from his statements and from the contradictions contained therein that he had removed those drugs with criminal intent; and they were doubtless

further persuaded towards that verdict by the State's additional evidence that on November 28, 1972, within hours after having checked the drugs out of the property room, Holloway made substantial payments on his accounts at the Equitable Trust Company, Colonial Credit Company, Union Trust Company, Levenson & Klein Company, and Montgomery Ward. In *Robinson v. State,* 18 Md. App. 678, 700, 316 A. 2d 268 (1973), we said:

> "The test of the sufficiency of the evidence in a jury trial is whether the evidence, if believed, either shows directly or supports a rational inference of facts to be proved from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged."

and, in *Metz v. State,* 9 Md. App. 15, 23, 262 A. 2d 331 (1970):

> "[T]hat the test for sufficiency is the same whether the evidence be direct, circumstantial, or provided by rational inferences therefrom."

We believe that there was more than a sufficiency of the evidence, direct, circumstantial, or inferential on which the jury could pass its verdict of guilty of the unlawful possession of narcotics.

*Judgment affirmed.*