## MELVIN WIDOMSKI *v.* CHIEF OF POLICE OF BALTIMORE COUNTY

[No. 511, September Term, 1978.]

*Decided February 7, 1979.*

The cause was argued before GILBERT, C. J., and MASON and MACDANIEL, JJ.

*Leo Howard Lubow,* with whom were *Paul Mark Sandler* and *Freishtat & Schwartz* on the brief, for appellant.

*John A. Austin, Assistant County Solicitor for Baltimore County,* and *Edward F. Seibert, Chief Assistant County Solicitor,* with whom was *J. Carroll Holzer, County Solicitor,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

This appeal has grown out of a "Jekyll and Hyde" operation nefariously conducted by a few Baltimore County police officers assigned to the Dundalk area in 1970-1972. The Internal Affairs Section of the County Police Department supplied the answer to Juvenal's [1] question of "who is to guard the guards themselves," by uncovering the clandestine turnabout activities of those few police officers who used their shields as a license to steal. During the course of Internal Affairs' investigation, it discovered that the appellant, Lieutenant Melvin Widomski, believed to be a knowledgeable witness, was, in fact, one of those that the investigators sought. As a direct result of the discovery, Widomski was subsequently dismissed from the force. He appealed the dismissal to the Circuit Court for Baltimore County, where Judge Walter R. Haile affirmed the action taken by the Chief of Police in firing Widomski.

The appellant seeks to have this Court reverse the judgment of the circuit court and order appellant's reinstatement as a police lieutenant.

To accomplish that end, we would have to conclude that Judge Haile erred in upholding the Baltimore County Police

---

1. Decimus Junius Juvenal (A.D. c. 50-c. 130) *Satires* VI, 1. 347

Department Disciplinary Board's (Board) finding that Widomski was guilty of lying, filing false reports, receiving stolen goods, and of petty theft. The basis of the request for reversal is not that Widomski did not do the acts attributed to him, but rather that the police department's investigators failed to adhere to the procedural requirement of the "Law-Enforcement Officers' Bill of Rights." Md. Ann. Code art. 27, §§ 727-734D.

Widomski presents us with nine (9) issues masquerading as but three (3). Before considering them, seriatim, we shall briefly set out the facts from which this appeal arose, adding in our subsequent discussion of an issue, such further facts as necessary to that particular matter.

In the year 1976, the Internal Affairs Division of the Baltimore County Police force conducted an investigation of improper and illegal conduct by police officers attached to the Dundalk district during the time period 1970-1972. At the time under scrutiny, then Corporal Widomski had been stationed in Dundalk. On two dates, March 11, 1976, and June 18, 1976, police officers assigned to Internal Affairs interviewed Widomski in connection with the investigation, but according to testimony at the Board hearing, Widomski was not then a suspect. Lieutenant William Ferrell, acting on orders from a superior,[2] conducted a polygraph examination of Widomski on August 6, 1976, "to see if [Widomski] had any knowledge that had been undisclosed" with respect to the Dundalk investigation.[3]

Lieutenant Ferrell's testimony was that when he administered a polygraph test, he usually asked follow-up questions when the interviewee answered in a manner that "would arouse ... [Ferrell's] suspicions" as to the truthfulness of the answer. He followed that procedure with Widomski. Immediately upon review of the polygraph results, Ferrell determined that Widomski had been untruthful in

---

2. Identified in the transcript as "Captain Willinski."

3. Lieutenant Ferrell told the Board that according to the orders he received from a superior officer who was conducting the Dundalk investigation, Widomski "was not a suspect, don't worry about his rights during the polygraph examination."

negatively responding to four (4) questions.[4] Ferrell then returned to the examination room where he informed Widomski that the test "indicated ... [Widomski] wasn't being completely truthful to some of the questions," and Ferrell asked Widomski if there was "anything else that he wanted to tell me about it." Over objection of appellant, Lieutenant Ferrell was permitted to testify that Widomski named "at various times different officers that he had observed doing different things." We infer, in the light of the nature of the proceedings before the Board, that "doing different things" meant things of an unlawful nature.

Appellant's counsel, who had requested and obtained from the Board a continuing objection to Ferrell's testimony because of the "lack of voluntariness of the interrogation" by Ferrell, a short while later interposed another objection on the ground that the interview had become accusatory, and that at that stage Widomski should have been formally informed of his rights under Md. Ann. Code art. 27, § 728 (b). The Board chairman sustained the objection, stating:

> " 'This Board rules that at the time we got from the inquisitory stage until the time there was a positive reaction on the polygraph, there should have been a professional view from the law enforcement officer's viewpoint that he should have been advised of his rights, and we are going to discontinue any more testimony with this witness.' "

---

4. The four (4) questions were:

— "Do you know any more about Dundalk officers stealing than what you have told the Internal Affairs about?"

— "Have you ever stolen anything else on the job that you have not told Internal Affairs about?"

— "Did you know prior to this investigation that [five named suspects] were involved in criminal acts other than what you told Internal Affairs about?"

— "Is fear of reprisal the only reason that you cannot tell the complete truth about this matter?"

Prior to the examination, Widomski had informally admitted to Ferrell that he had not been completely truthful in prior interviews because of fear of reprisals.

Asked whether the Board would accept the testimony already elicited, [the chairman] responded:

> " 'To the point that we have heard so far, but this will be a consideration in our final judgment, so I say to you that this Board feels as professional law enforcement officers that this man's rights were violated once we set the seed [*sic*] to move from the inquisitory and it was felt validly from his reactions and response from a professional polygraph operator that, in fact, now he could become a party.' "

Immediately following the polygraph examination, Sgt. Philip Huber of the Internal Affairs Section, was told to "interview" [5] Widomski "in reference to certain revelations that were brought out in the polygraph examination and I [Sgt. Huber] was not told any of the revelations." After giving Widomski a "Notification to Accused of a Complaint," an explanation of the Police Officers' Bill of Rights, and *Miranda* [6] warnings, Sgt. Huber began to interrogate appellant. The questioning was tape recorded.

At the hearing before the Board, the appellant's attorney objected to Sgt. Huber's testimony, regarding his interrogation of Widomski. The objection was double barreled: 1) Art. 27, § 728 (b) (8) was not complied with inasmuch as the taped record did not include the portion of the interrogation wherein the appellant was given his rights, and 2) a question of voluntariness of appellant's statement was raised by the virtue of a strike out on the "Explanation of Police Officers' Rights" form. The form contained a question which asked, "Do you want a lawyer present at this time?" Widomski's response of "yes" was written in the appropriate place, was crossed out and then the word "no" was written. The initials of appellant, "MW," appear alongside the reply "no." The Board overruled the objection.

---

5. It is clear from the record, that the Board, as well as counsel for the Police Department and the appellant, realized that the "interview" by Sgt. Huber was an interrogation and it was so treated.

6. Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

Over the continuing objection by appellant's counsel, Sgt. Huber told the Board that during the interrogation, Widomski said he had "taken a box of grass seed" valued at $5, "a Fisher-Price toy," valued at between $6 and $8, "two trash cans" and "a can of car wax"; that Widomski failed to report improprieties of other officers for fear of retaliation; that Appellant Widomski knew that another officer, after deliberately driving a police vehicle into a store door in order to gain entry into the building, filed a false report to cover up the impropriety; that appellant accepted a ladies watch and a pair of sunglasses from other officers; and that Widomski accepted fifteen dollars from an officer who gave that sum to him without comment.

Widomski did not testify. The Board, as we have seen, adjudged Widomski guilty of a number of the charges and recommended his dismissal from the department stating:

> "What concerned us was the overview that those three minor larcenies impugned the credibility of ... [Widomski] to actively function as a supervisor over the control of his people and failed to give him, allow him the flexibility to come forth in that time frame of 1970 to '72 when conditions were conclusive in this Department that there were other resources he could have sought out ... but ... these minor larcenies ... didn't permit him to do that.
>
> ...
>
> The Board feels that his future, to testify in situations where there is a one on one and no physical evidence present and the guilt or the innocence of a Defendant would be based solely on the basis of the Lieutenant's testimony would certainly be an issue by any defense." [7]

The Chief of Police concurred, and Widomski was dismissed as of the date of his suspension.

7. In Mulligan v. State, 18 Md. App. 588, 308 A. 2d 418 (1973), this Court reversed a judgment because of the refusal of a trial judge to allow inquiry into a police lieutenant's credibility. The inquiry was to have been limited to the filing of false reports, a matter upon which the police lieutenant was adjudged guilty following a departmental hearing.

## I.

"Whether the decision of the Disciplinary Board is null and void for the reason that incident to its deliberations the Board played and considered portions of a tape that were not admitted into evidence?"

This issue arises from a misunderstanding of what was admitted into evidence, the tape recording of Sgt. Huber's interrogation of Widomski or a highly selective portion of that tape. Widomski asserts the latter, while the Chief of Police maintains it is the former. During the course of an argument over appellant's objection to testimony from Sgt. Huber in regard to the stolen sunglasses, Huber stated that his recollection was refreshed by his own notes of what was on the tape. Departmental counsel said that Widomski had been furnished a copy of the tape. Counsel for Widomski declared, "I would like to hear the tape at this time in regard to that one limited area." Major Vittek, the chairman of the Board, replied, "All right, we will rule on the admissibility and bring the tape in, or else we can be sitting here." Counsel for Widomski announced, "I have a copy [of the tape] if you can find a machine." The matter of the tape was "skipped" at that point and Sgt. Huber continued his testimony concerning Widomski's statement to Huber. Following the completion of Huber's testimony, the question of the tape again arose. Major Vittek opined:

> "The issue with the tape and the fact that we called for it, and of course, we would like to hear it and we could be here quite some time, so if it's all right with both of you gentlemen, unless you wish to introduce other people that we haven't heard, . . . [the Board would hear summation]."

The Major then exclaimed, "I see we have found it [the tape]." The transcript contains a court reporter note: "(Whereupon the pertinent part of the tape referred to above was played)," followed by the comment of counsel for the Department that he "*would like the tape to be in evidence,*

*at least for that portion we heard."* The reporter note states
"(The tape referred to above was marked Department Exhibit
No. 10)."

Summation of counsel was heard and then the Board
retired to consider the relevant and competent evidence
presented at the hearing. The Board found Widomski guilty.
Major Vittek then turned to Widomski's attorney and said,
"You did have some questions that you acquainted me
with . . . , and I think you better make that a matter of
record." Counsel then explained that it was his
"understanding that during the Board's deliberations a
portion of the tape was played by the Board which was not
the subject of the point of clarity for which the tape was
brought in." [8] In short, Widomski's lawyer charged that the
Board did not confine its listening of the tape to that portion
that dealt with the sunglasses, but that it listened to other
parts of the tape which had not been introduced into evidence.
The transcript relative to the admission of the tape was read
to the Board which ruled, in effect, that irrespective of what
Widomski's attorney believed at the time the tape was offered
into evidence, the entire tape was introduced and not just the
limited part sought by Widomski.

Our review of the transcript, the pertinent part of which
is quoted above, leads us to conclude that although Widomski
may have intended that only that specific segment of the tape
dealing with the question of the sunglasses was being
introduced, the entire tape was admitted without objection.
We note that the Departmental counsel said he "would like
the tape to be [admitted] in evidence, at least for that portion
we heard." Such a statement is an expression that counsel
sought the introduction of the entire tape, but that if the
Board would not agree, then the Board should admit *at least*
that portion of the tape to which all had listened. The Board's
admission of the tape into evidence was an acceptance of the
entire tape and not just a part of it, regardless of what
Widomski's attorney believed was being received into
evidence by the Board. The lack of a timely objection

8. The record is silent as to how counsel for Widomski actually learned
that the Board had listened to all or other parts of the tape.

constitutes a waiver. Widomski's belated objection that the tape, as distinguished from a mere section of it, was heard by the Board was not only too late, but bottomed on a mistake of fact. In any event, the objection, coming as it did after the Board's findings were announced, is untimely.

## II.

"Whether the testimony of Lt. Ferrell and Sgt. Huber should have been excluded from evidence because the interrogations that they conducted contravened MD. ANN. CODE art. 27, § 728 and *Miranda v. Arizona*?"

Widomski has subdivided issue II into various attacks on the propriety of the admission into evidence of the testimony of Lt. Ferrell and Sgt. Huber.

## A.

"The polygraph examination conducted by Lt. Ferrell should have been conducted in accordance with Art. 27, § 728 because (1) just prior to the test Widomski conceded that he had been untruthful in a past interview, and (2) the questions asked were of such a nature as to elicit responses which 'could lead to disciplinary action.'"

Md. Ann. Code, art. 27, § 728 (b) states that "[w]henever a law-enforcement officer *is under investigation or subjected to interrogation* by a law-enforcement agency, for any reason which could lead to disciplinary action, demotion or dismissal, the investigation or interrogation" must be conducted in accordance with various procedures set out in the statute. (Emphasis supplied.) The testimony at the hearing before the Board demonstrates that at the time Widomski was asked to submit to the polygraph examination, he was neither *under investigation* nor was he *interrogated* for reasons which "could [have led] to disciplinary action, demotion or dismissal." In fact, Lt. Ferrell flatly said, "I was told that he

was not a suspect, don't worry about his rights during the polygraph examination." The Lieutenant was asked, "Did Captain Willinski indicate to you that Lt. Widomski might be involved in this?" His response was, "No, not in any way other than the possibility that he might, having been there at the time, have had knowledge of what was going on."

We believe it was reasonable for the Board to conclude that at that point in the case, Widomski was thought to be merely a witness who might possibly aid the Department's investigation, and there was no necessity to conduct the polygraph examination in accordance with Md. Ann. Code art. 27, § 728.

The Board determined that the examination of Widomski moved from the inquisitorial stage to the investigatory stage when Lt. Ferrell decided that Widomski had not been completely truthful in his answers. The Board did not allow Ferrell to testify as to anything Widomski said after Ferrell made his decision relative to Widomski's untruthfulness, because Widomski had not been advised of his rights pursuant to section 728.

Inasmuch as the testimony by Lt. Ferrell was limited to events occurring prior to the time Widomski became a suspect, there was no violation of section 728.

### B.

"The Huber interrogation violated art. 27, § 728 because (1) it immediately succeeded Ferrell's interrogation, thereby subjecting Widomski to two interrogators rather than to one as required, and (2) a complete record was not kept of the interrogation."

To reach this issue we have to assume that Widomski is focusing his attack on that part of Lt. Ferrell's questioning that came into being after Ferrell decided Widomski was a suspect. We so assume because there was no interrogation of Widomski within the meaning of the statute until the matter moved from an inquisitorial to an accusatorial status. Ferrell's testimony relative to the accusatorial stage was not

admitted so that we have no way of knowing the length, breadth or depth of his questioning of Widomski. We shall, however, give Widomski the better of it by inferring that the interrogation cut three ways, "deep, wide and continuously." With that inference firmly in mind, we begin our trek toward a resolution of the Huber interrogation.

Then Md. Ann. Code art. 27, § 728 (b) (3) is the statutory basis for Widomski's argument. That section provided:

> "The law-enforcement officer under investigation shall be informed of the name, rank, and command of the officer in charge of the investigation, the interrogating officer, and all persons present during the interrogation. All questions directed to the officer under interrogation shall be asked by and through one interrogator." [9]

We do not interpret section 728 (b) (3) in the same manner as Widomski, nor do we observe anything in the statute that proscribes successive interrogations, particularly when, as here, the questioning was conducted by a different police officer in a different locale, so long as there is compliance with Md. Ann. Code art. 27, § 728 (b) (6). Subsection (b) (6) mandates that interrogation periods shall be a reasonable length and timed so as to allow for personal necessities and rest periods. No complaint relative to subsection (b) (6) is registered by Widomski. Therefore, we consider only subsection (b) (3).

We read that subsection to mean that at a particular interrogation session only one person may conduct the interrogation. The subsection was enacted to avoid the use of the so-called "Mutt and Jeff," or "Good Guy, Bad Guy"

---

9. Laws 1977, ch. 366, amended subsection 728 (b) (3) as follows:

"The law-enforcement officer under investigation shall be informed of the name, rank, and command of the officer in charge of the investigation, the interrogating officer, and all persons present during the interrogation. All questions directed to the officer under interrogation shall be asked by and through one interrogator during any one interrogating session consistent with the provisions of subsection (b)(6) of this section."

The amendment was not effective until July 1, 1977. It has no effect on this case.

approach to interrogating a suspect, whereby one or more of the interrogators adopts a harsh, threatening attitude calculated by words or tone of voice to intimidate the suspect into admission, while the other interrogator assumes the posture of a friend of the downtrodden and the protector of the suspect. That posture, of course, is equally effective in bringing about the suspect's confession. Such action falls short of the prohibited "third degree." It is directed toward the psychic rather than the physical. The former is a permissible police tactic, the latter is not.

The interrogation of Widomski by Huber was conducted within the frame work of the "Law-Enforcement Officers' Bill of Rights." Judge Haile did not err in concluding that the Board properly admitted Huber's testimony concerning that interrogation.

The second part of Widomski's assault on the Huber interrogation is focused on then subsection 728 (b) (8) of the Law-Enforcement Officers' Bill of Rights which provided:

> "A complete record, either written, taped or transcribed, shall be kept of the complete interrogation of a law-enforcement officer, including all recess periods. A copy of the record shall be available to the officer or his counsel upon request." [10]

Basically, Widomski contends that "no record was kept of the dialogue which prompted ... [him] to change to the negative his response to the question 'Do you want a lawyer present at this time?' " We glean, although it is by no means clear, that Widomski's position is that the record of the interrogation must be 1) written, or 2) taped or 3) transcribed, and that whichever of the three methods is employed, the other two are excluded. We do not believe such a narrow,

---

**10.** Laws 1977, ch. 366, amended subsection 728 (b) (8). The second sentence was deleted from the 1974 act and the following substituted therefor:

"Upon completion of the investigation, and upon request of the law-enforcement officer under investigation or his counsel, a copy of the record of his interrogation shall be made available not less than ten days prior to any hearing."

restrictive construction has been legislatively mandated. We read subsection 728 (b) (8), wherein it states that the record of the interrogation shall be *"either* written, taped or transcribed,"* to mean that the record may be wholly written, or wholly taped, or wholly transcribed, or a combination of any two or more of the three methods, so long as there is a complete and preserved record for the review by counsel and by a court, if there be an appeal. Under E (2) *infra,* we have summarized Sgt. Huber's testimony relative to the execution by Widomski of the waiver of counsel. The Sergeant's version of the events surrounding that waiver stands in the record unchallenged. Thus, even though the colloquy between Huber and Widomski was not "written, typed or transcribed," the failure to comply with the strict letter of the statute is harmless in the light of any contradictory testimony.

## C.

"Evidence obtained in violation of art. 27, § 728 is inadmissible, and hence, the disciplinary board erred in admitting into evidence over the objection of counsel the testimony of Lt. Ferrell and Sgt. Huber."

Widomski's next averment presupposes that the Court would decide that Lt. Ferrell and Sgt. Huber obtained evidence in violation of Md. Ann. Code art. 27, § 728. That portion of Lt. Ferrell's evidence that was obtained in violation of the Law-Enforcement Officers' Bill of Rights was not received by the Board. The testimony of Ferrell and Huber that was heard by the Board was admissible. There was, as we have said, no evidence received by the Board that had been obtained in violation of the strictures of Md. Ann. Code art. 27, § 728.

## D.

"The testimony of Sgt. Huber additionally is inadmissible for the reason that Huber's interrogation would not have been conducted but for the illegally administered polygraph test."

The attempt by Widomski to exclude Huber's testimony is based on the faulty premise that the "illegally administered polygraph test" invokes the doctrine of the "fruit of the upas tree." We need not and do not decide whether the exclusionary rule, founded in the criminal law, extends in this State to administrative agency proceedings involving civil matters,[11] inasmuch as it appears here wearing a maiden's blush. In short, it was not raised and decided in the trial court; it is not properly before us. Md. Rule 1085.

### E.

#### "Violation of *Miranda v. Arizona*" [12]

#### (1)

> "Lt. Ferrell conducted a custodial interrogation of Widomski, and hence, should have read Widomski his rights."

This argument is but a paraphrasing of that raised in II A, above, with *Miranda* cranked into the matter. To make *Miranda* applicable there must have been a custodial interrogation of Widomski, an element that he perceives in the instant case. The late Chief Justice Warren penned in *Miranda* that:

> "[T]he prosecution may not use statements ... stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.*" (Emphasis supplied.) 384 U. S. at 444.

---

**11.** *But see* Powell v. Zuckert, 366 F. 2d 634 (D.C. Cir. 1966); Saylor v. United States, 374 F. 2d 894 (Ct. Cl. 1967); Rinderknecht v. Maricopa County Employees Merit Sys., 21 Ariz. App. 419, 520 P. 2d 332, *vacated by reason of settlement* 111 Ariz. 174, 526 P. 2d 713 (1974); Finn's Liquor Shop v. State Liquor Authority, 24 N.Y.2d 647, 249 N.E.2d 440 (1969).

**12.** *See* n. 6, *supra*.

The above-quoted passage contains a footnote which states, at 444, that "[t]his is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." The words of that footnote have been instructive in guiding the Maryland appellate courts in defining the perimeters of just what a "custodial interrogation" is. Widomski relies upon *Myers v. State,* 3 Md. App. 534, 240 A. 2d 288 (1968), wherein this Court quoted the California District Court of Appeals in *People v. Hazel,* 60 Cal. Rptr. 437, 440-41 (1967), saying:

> " * * * [C]ustody occurs if a suspect is led to believe, as a reasonable person, that he is being deprived or restricted of his freedom of action or movement under pressures of official authority. * * * [T]he custody requirement of *Miranda* does not depend on the subjective intent of the law enforcement officer-interrogator but upon whether the suspect is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. * * * "
> 3 Md. App. at 537, 240 A. 2d at 290.

Then Chief Judge Murphy stated in *Myers* that "the appellant was the prime suspect in a murder case and the police had undertaken to find him." 3 Md. App. at 538, 240 A. 2d at 291. The Court held that when the police ordered Myers into their squad car and questioned him while driving to the police station there had been custodial interrogation. The testimony in the case at Bar is markedly different. Widomski was not a suspect until after the polygraph examination. Neither was he "deprived of his freedom of action in any significant way," nor was he "placed in a situation in which he reasonably ... [believed] that his freedom of action or movement ... [was] restricted...." The record does not indicate that Widomski had been either formally ordered to attend the examination, or that he would suffer any penalty for failure to attend.

The record does disclose, however, that Captain Joseph Talley had initially asked Widomski "to be there" for an

interview. "There," we infer, was not the polygraph examination room but rather the headquarters of Captain Talley. In any event, Talley made manifest that Widomski "was not ordered. He was asked to come [to the headquarters for an interview.]"[13] If the record demonstrated that Widomski had been ordered to submit to the polygraphic examination, and if the record further disclosed a departmental policy of disciplinary action against an officer who refused to undergo that test, *Holloway v. State,* 26 Md. App. 382, 339 A. 2d 319 (1975) would be dispositive. There we said that a police department's written policy threatening disciplinary action against officers who refused to give a statement when ordered to do so amounted to coercion, and that statements obtained in such a manner would be inadmissible. *See Garrity v. New Jersey,* 385 U. S. 493, 87 S. Ct. 616, 17 L.Ed.2d 562 (1967). The record in the case *sub judice* does not, however, support a finding that Widomski was ordered, under penalty of disciplinary action, to subject himself to the polygraph test.

We have already seen that when Ferrell interviewed Widomski, the appellant was not a suspect, nor was there any reason to believe he was involved in the misdeeds and unlawful acts of some of the police officers stationed in Dundalk in 1970-1972. *Miranda* warnings were no more required to be read, at that point, to Widomski than they would be to any witness not a suspect before a statement is made. *Miranda* simply has no application.

(2)

"Sgt. Huber improperly continued to question Widomski after Widomski requested the presence of an attorney."

Finally, on the appellant's multilateral "second issue," he argues that "(1) . . . [his] statement was not voluntary, and

---

13. We do know, however, that Lt. Ferrell had been ordered to give polygraph examinations to many of the officers on the suspect shift. Such an order did not necessarily embrace Widomski.

(2) all questioning should have ceased once . . . [he] requested an attorney." The record is crystalline that Sgt. Huber followed, to the letter, the procedures of art. 27, § 728 in establishing the voluntariness of Widomski's statements. While there was some dispute before the Board because of the slash mark through the original answer of "yes" and the substitution of the answer "no" to the printed question of whether Widomski desired an attorney, the testimony of Sgt. Huber shows that it was Widomski who was the instigator of further conversation on the point following the entry by Widomski of "yes" to that critical question. Sgt. Huber narrated that he would have stopped the interrogation, but that Widomski twice asked what Huber would do in his place. The first time Huber told Widomski that it was appellant's decision to make. The second time, Huber merely said that he would tell the truth. Widomski's questions and Huber's answers thereto are neither a continuation of the interrogation of Widomski, nor a coercion to effect a waiver of Widomski's right to have counsel present. Indeed, as the Board pointed out, given Widomski's long experience with the police department, he certainly was aware of what he was doing, and there could hardly have been a more knowing and intelligent waiver of the right to counsel.

### III.

"By forbidding Widomski to take the stand for the limited purpose of testifying that his statement to Huber was involuntary, the hearing board (1) violated Widomski's Fifth Amendment rights, (2) violated Art. 27, § 730 (c), and (3) deprived Widomski of procedural due process."

The Board would not allow Widomski to take the stand for the limited purpose of testifying that his statement to Sgt. Huber was involuntary.

After the objection on the ground of lack of voluntariness to the admission of appellant's statement to Sgt. Huber was overruled, appellant moved that he be allowed to testify exclusively as to the voluntariness of the waiver of his right

to counsel. The Department's attorney objected. He maintained that such a procedure was not permissible in an administrative hearing. The Board declined to allow Widomski to testify for that limited purpose only, stating that if he chose to testify he would be subject to examination with respect to the merits of the case. A proffer was made by counsel for the appellant as to what Widomski's testimony would be.

Appellant, in this Court, asserts that:

> "In so holding, the Board violated Widomski's Fifth Amendment privilege against self-incrimination, for in dictating that if Widomski took the stand he would waive his Fifth Amendment rights, the Board concurrently forced Widomski to waive his Fifth Amendment right to exclude from evidence an incriminating statement that he wished to expose as being involuntary."

To bolster his argument, he cites us to *Boulware v. Battaglia,* 344 F. Supp. 889, 902 (D. Del. 1972) for the proposition that "the Fifth Amendment privilege against self-incrimination extends to persons in civil or administrative procedures is clearly established." With that general statement we wholeheartedly agree. Yet, it is just as clearly established in Maryland that administrative bodies are not ordinarily bound by the strict rules of evidence of a law court. *Hyson v. Montgomery County Council,* 242 Md. 55, 70, 217 A. 2d 578, 587 (1966). In that connection, we stated in *American Radio-Telephone Service, Inc. v. Public Service Commission,* 33 Md. App. 423, 434-35, 365 A. 2d 314, 320 (1976), "[a]lthough administrative agencies are not bound by the technical common law rules of evidence, they must observe the basic rules of fairness as to the parties appearing before them." *See Dickinson-Tidewater, Inc. v. Supervisor of Assessments,* 273 Md. 245, 253, 329 A. 2d 18, 24 (1974); *Montgomery County v. National Capital Realty,* 267 Md. 364, 376, 297 A. 2d 675, 681 (1972); *Dal Maso v. Board of County Commissioners,* 238 Md. 333, 337, 209 A. 2d 62, 64 (1965). Procedural due process in administrative law is recognized to be a matter of greater flexibility than that of strictly judicial proceedings. *NLRB v.*

*Prettyman,* 117 F. 2d 786, 790 (6th Cir. 1941); *Lacomastic Corp. v. Parker,* 54 F. Supp. 138, 141 (D. Md., 1944). The concept of due process requires that we examine "the totality of the procedures afforded rather than the absence or presence of particularized factors." *Boulware v. Battaglia,* 344 F. Supp. at 904.

We think that the mandate of Md. Ann. Code art. 27, § 730, was satisifed in the case at Bar. The police department notified Widomski of the charges and the hearing; kept a record of the hearing; afforded appellant ample opportunity to present both evidence and argument with respect to the issues involved; admitted probative evidence; allowed appellant's counsel wide latitude in cross-examination of Departmental witnesses; and made extensive findings of fact in its report and recommendations to the Police Chief.

Appellant seeks to inject into administrative hearings the criminal law with respect to the admission of confessions. He cites us to a number of cases, all dealing with suppression hearings concerning the voluntariness of confessions. *See e.g., Simmons v. United States,* 390 U. S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247 (1968); *Malloy v. Hogan,* 378 U. S. 1, 84 S. Ct. 1489, 12 L.Ed.2d 653 (1964); *Bailey v. United States,* 389 F. 2d 305 (D.C. Cir. 1967). Widomski, by his reliance on the criminal confession suppression cases, is in effect equating the instant case to a criminal trial. It is not. Nothing in section 730 requires, or suggests for that matter, that it is the equivalent of a criminal proceeding. Subsection (c) of section 730 does provide, "[t]he hearing Board conducting the hearing shall give effect to the rules of privilege recognized by law," but that wording means that a person may not be compelled to testify against himself. Widomski was not so compelled. He was not called upon by the Department to testify in the case, nor was the fact that he did not testify used against him. Although his admission to Sgt. Huber was received in evidence, Widomski had an opportunity to testify and deny Huber's statement relative to voluntariness but elected not to do so because the Board refused to permit Widomski's testimony to be limited to the voluntariness *vel non* of the admission. We know of no rule of law that requires

an administrative agency to adhere strictly to rules of criminal procedure. Had such a procedure been contemplated by the legislature, they would not have left the conduct of a hearing in the hands of laymen, even though they be trained law-enforcement officers.

We think due process of law, under either the Maryland or Federal Constitution, was not affronted by the Board's declination of Widomski's proposed "limited" testimony.

We adopt the reasoning of Chief Judge Wright of the U.S. District Court for the District of Delaware, as enunciated in *Boulware v. Battaglia, supra*:

> "The Court is of the opinion that absent some particular factor of such import as to deny to ... [appellant] an effective opportunity to participate in and defend ... [himself] in the hearings, the procedures utilized were sufficient to fulfill constitutional requirements.
>
> . . .
>
> ... The Trial Board adhered to the ... [Statutory] Rules governing such hearings and afforded ... [appellant] an orderly opportunity to hear evidence against ... [himself] and present a defense. . . . *The Federal Constitution does not command specific due process procedures, nor does it impose precise trial type requirements on state administrative disciplinary proceedings."* 344 F. Supp. at 905 (Emphasis supplied.)

Judge Haile did not err in affirming the action of the Chief of Police in dismissing Widomski from the Baltimore County Police Department.

*Judgment affirmed.*
*Costs to be paid by appellant.*