766 A.2d 169

**Charles COLEMAN**

v.

**ANNE ARUNDEL COUNTY POLICE DEPARTMENT.**

**No. 2713, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Feb. 1, 2001.

**420**

422

Byron L. Warnken (Gary C. May and Law Offices of Bonnie L. Warnken, on the brief), Baltimore, for appellant.

Julie T. Sweeney, Senior Asst. County Atty. (Linda M. Schuett, County Atty., on the brief), Annapolis, for appellee.

Argued before MOYLAN,* KENNEY, VICTOR K. BUTANIS (specially assigned), JJ.

KENNEY, Judge.

This appeal arises out of disciplinary action taken against appellant, Charles Coleman, by the Chief of Police of Anne Arundel County (the "Chief") pursuant to a recommendation from the Administrative Hearing Board (the "Board"). Appellant petitioned for judicial review, and the Circuit Court for Anne Arundel County affirmed the Board's decision. Appellant raises five questions for our review:

1. Whether the Department erred, as a matter of law, and acted in an arbitrary and capricious manner, when it failed to comply with departmental rules mandating an interview with Cpl. Coleman, which would have caused neutral investigators to terminate the investigation with the charges "unsustained"?

2. Whether the Department denied due process of law, and violated the express requirements of the Family and Medical Leave Act (FMLA), when the Board denied a continuance, despite undisputed psychiatric evidence of, and medical treatment for, a severe mental disability (an FMLA "serious health condition"), which caused the Department to order Cpl. Coleman to take leave under the FMLA?

3. Whether the Department denied due process of law, and acted in an arbitrary and capricious manner, when the Board Chair denied a motion to recuse himself, despite (1) Cpl. Coleman's entitlement to a peremptory challenge

---

* Moylan, J. participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of the Court.

against the Chair through the collective bargaining agreement, and (2) the Chair's bias against Cpl. Coleman by making a complaint that he lacked integrity and then denying having made the complaint until confronted?

4. Whether the Department erred, as a matter of law, by seizing evidence from Cpl. Coleman's person, in violation of his Fourth Amendment protection against unreasonable searches and seizures, and then using that evidence to convict him of eight theft-related charges?

5. Whether the Department denied due process of law when it convicted Cpl. Coleman of eight theft-related counts, and terminated him just shy of retirement, based on a mere preponderance of the evidence—thus tolerating a 49% risk of error—when both the Supreme Court and Maryland mandate a burden of persuasion standard of clear and convincing evidence for administrative charges of theft and dishonesty?

## STATEMENT OF FACTS

On December 4, 1997, the Internal Investigation Division (IID) of appellee, Anne Arundel County Police Department (the "Department"), conducted an investigation targeting appellant, a nineteen year veteran of the force. A number of items were assembled to be turned over to appellant to determine whether he would properly process them. The following articles were put into a green cloth fanny pack: three Tylenol tablets, a clear plastic baggy with white residue, two black film canisters with leafy vegetable residue, a Mickey Mouse key chain with a key and toy baseball bat attached, and a total of $76.25, consisting of three nickels, one dime, two $20 bills, three $10 bills, one $5 bill, and one $1 bill.

Two Howard County detectives, posing as ordinary citizens, turned the fanny pack over to appellant. They advised him that they had found the pack containing no identification outside a convenience store. Appellant asked them no questions and let them leave without taking down any information. Appellant radioed in for a case number for the recovered

property and potential controlled dangerous substances (CDS) and then returned to the police station. Appellant then called the convenience store and spoke with the clerk, who indicated that no one had reported lost or stolen property.

Appellant prepared the suspected CDS for forwarding to the laboratory for testing. He placed the CDS into a sealed envelope, labeled the envelope appropriately, had the envelope witnessed, and recorded it in the logbook. These actions comported with departmental regulations.

Appellant separated the bills from the rest of the items left in the fanny pack. He filled out a "Recovered Property Form" on which he made the following notations: "Mickey Mouse key chain with one key" and "3 nickels, 1 dime American currency." These items were placed in a blue envelope. Neither the Tylenol tablets nor the bills were turned in.

Appellant has maintained that it was his understanding that he needed a supervisor to count the paper currency, seal the envelope containing it, and sign the envelope. Because there was no supervising officer on duty that evening, and he believed it unwise to leave the money on his desk, appellant put it in his shirt pocket. He took it with him with the intention of having it signed in later by a supervisor. Believing that he would see his direct supervisor at some point during the shift, appellant did not seek out a supervisor. Instead, he went back out to work on making his performance levels for DWIs and traffic tickets.

Appellant took the money home with him. The next morning, he put it with the rest of his money, and took it with him to a court appearance. He stopped by a fast food restaurant and paid with a five dollar bill.

After court and pursuant to orders to return to the station, appellant was ordered by the on-duty lieutenant that afternoon, Lieutenant Kenneth Schlein ("Lt. Schlein"), to empty his pockets and, after he did, to surrender the money to him. Schlein testified at the hearing that the following exchange, initiated by appellant, took place:

[Appellant:] It's here.

[Lt. Schlein:] What's here?

[Appellant:] All the money from last night: sixty-five dollars;[1] I knew it was a setup; It was stupid of me. Appellant pulled a money clip out of his pocket and took $71 from the total amount he had and began comparing the bills himself to the ones an IID officer had photocopied the previous day.

Lt. Schlein confronted appellant with the five dollar difference, and appellant stated that he must have spent the money. Coleman was served an emergency suspension notice the same day.[2] On December 12, 1997, he was charged with violating eight Anne Arundel County Police Department rules, regulations, policies and/or procedures. We quote from the Statement of Facts contained in appellant's brief, which accurately summarize the charges as follows:

> Charge 1 alleged that Cpl. Coleman failed to conform to "Md. Ann.Code art. 27, section 342" (the theft offense statute) when he "stole the $76.00 instead of reporting its recovery and submitting it ..." Charge 2 alleged that Cpl. Coleman violated the integrity of the reporting system when he "[f]ailed to submit [an] accurate and complete recovered property incident report." Charge 3 alleged that Cpl. Coleman engaged in conduct unbecoming a police officer by committing "[t]heft" in that he "stole the $76.00" and his "conduct was criminal, dishonest and improper." Charge 4 alleged that Cpl. Coleman neglected his duty and had an unsatisfactory performance "by stealing $76.00." Charge 5 alleged that Cpl. Coleman violated the reporting requirement regarding property or contraband by committing "[t]heft" when he "stole the $76.00 instead of reporting its recovery." Charge 6 alleged that Cpl. Coleman failed to comply with the Recovered Property Form by "not put[ting

---

1. There was actually $76.00 in the fanny pack, but all indications were that appellant merely made a mistake about the amount he had recovered the night before.

2. Appellant was suspended with pay and notified that he would be assigned to administrative duties.

$76] on Recovered Property Form." Charge 7 alleged that Cpl. Coleman violated the truthfulness requirement by "[i]ntentional misrepresentation by not mentioning $76." Charge 8 alleged that Cpl. Coleman violated his oath of office and the Code of Ethics by the fact that he "[s]tole the $76 ..., was dishonest in thought and deed, and showed disrespect for ... the law against theft."

The hearing before the Board was originally scheduled to take place on February 3, 1998. Pursuant to appellant's request, the hearing was continued to February 9, 1998. After an additional request by appellant, the hearing was again postponed from February 9, 1998, to March 11, 1998. Additional correspondence then took place between IID and appellant wherein appellant requested hearing dates of April 27, 28, and 29, 1998. The Chair of the Board, Lieutenant Thomas Rzepkowski ("Lt. Rzepkowski"), granted this further continuance, and the hearing began on April 27, 1998.

In the meantime, on or about April 6, 1998, appellant was placed on Family and Medical Leave pursuant to the FMLA due to mental illness. Appellant's personal physician, Dr. Dvoskin, identified his illness as "adjustment disorder with depressed mood, consider major depression." Dr. Dvoskin certified that appellant was unable to perform his duties and that it would not be possible for the Department to offer him reasonable accommodations so that he could continue working.

The Board convened for a hearing that lasted three days. On May 15, 1998, the Board sent its disposition and recommendation to the Chief. In its report, the Board made extensive findings of fact and unanimously found appellant guilty of all eight charges. The Board was also unanimous in its recommendations for punishment. It recommended termination in connection with Charges 1, 3, 4, 5, 7, and 8, and twelve day suspensions in connection with Charges 2 and 6. The Board, in light of the fact that appellant was so close to retirement, also stated the following:

> In recommending this punishment, it is *not* the intent of the Board to allow Corporal Coleman to safely retire and

avoid the stigma of being "fired." The recommendation *is* for **termination.** However, the Board carefully listened to and considered the mitigating factors which Defense Counsel persuasively explained, including the financial impact to innocent family members. The Board also scrupulously viewed Corporal Coleman's 19+ year personnel folder. With minor exception, Corporal Coleman's work history is positively portrayed with sufficient commendations for good work performance. In the absence of any evidence offered to the contrary, the Board felt that it did not want to take away that which Corporal Coleman had apparently earned.

In fashioning its recommendation, the Board decided to ask the Chief of Police to consider allowing Corporal Coleman to be credited for any leave which he was lawfully entitled to prior to actual **termination.** The Board did not have access to actual numbers credited to Corporal Coleman, but the Board intended Corporal Coleman to be **terminated** the moment his leave ran out. The Board also did not have particular knowledge of accepted County policy regarding retirement eligibility details, but the Board did not intend to give anything additional to Corporal Coleman to allow him to reach his actual retirement date. If his numbers gave him the time permitted by contract to leave County service at 20–years, he would then be **terminated** at that first available date. (Emphasis in original).

The Chief issued his final order on June 2, 1998, immediately terminating appellant's employment.

### Discussion

When reviewing a decision of an administrative agency, this Court's role is "precisely the same as that of the circuit court." *Dep't of Health & Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–304, 641 A.2d 899 (1994) (citation omitted). "Judicial review of administrative agency action is narrow. [Our] task on review is not to 'substitute [our] judgment for the expertise of those persons who constitute the administrative agency.'" *United Parcel Service, Inc. v. People's Counsel for Baltimore County,* 336 Md. 569, 576–577, 650 A.2d

226 (1994) (quoting *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 513, 390 A.2d 1119 (1978)).

Rather, "[t]o the extent the issues on appeal turn on the correctness of an agency's findings of fact, such findings must be reviewed under the substantial evidence test." *Dep't of Health & Mental Hygiene v. Riverview Nursing Centre, Inc.,* 104 Md.App. 593, 602, 657 A.2d 372, *cert. denied,* 340 Md. 215, 665 A.2d 1058 (1995) (citation omitted). The reviewing court's task is to determine "whether there was substantial evidence before the administrative agency on the record as a whole to support its conclusions." *Maryland Comm'n on Human Relations v. Mayor & City Council of Baltimore,* 86 Md.App. 167, 173, 586 A.2d 37, *cert. denied,* 323 Md. 309, 593 A.2d 668 (1991). The court must exercise a "restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions." *State Admin. Bd. of Election Laws v. Billhimer,* 314 Md. 46, 58–59, 548 A.2d 819 (1988) (quoting *Supervisor of Assessments of Montgomery County v. Asbury Methodist Home, Inc.,* 313 Md. 614, 625, 547 A.2d 190 (1988)).

The reviewing court's analysis has three parts:

1. First, the reviewing court must determine whether the agency recognized and applied the correct principles of law governing the case. The reviewing court is not constrained to affirm the agency where its order "is premised solely upon an erroneous conclusion of law."

2. Once it is determined that the agency did not err in its determination or interpretation of the applicable law, the reviewing court next examines the agency's factual findings to determine if they are supported by substantial evidence, i.e., by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. At this juncture, "it is the agency's province to resolve conflicting evidence, and, where inconsistent inferences can be drawn from the same evidence, it is for the agency to draw the inference."

3. Finally, the reviewing court must examine how the agency applied the law to the facts. This, of course, is a judgmental process involving a mixed question of law and fact, and great deference must be accorded to the agency. The test of appellate review of this function is "whether, ... a reasoning mind could reasonably have reached the conclusion reached by the [agency], consistent with a proper application of the [controlling legal principles]."

*Comptroller of the Treasury v. World Book Childcraft Int'l, Inc.,* 67 Md.App. 424, 438–439, 508 A.2d 148, *cert. denied,* 307 Md. 260, 513 A.2d 314 (1986) (quoting *Ramsay, Scarlett & Co., Inc. v. Comptroller of the Treasury,* 302 Md. 825, 834–838, 490 A.2d 1296 (1985)).

## I.

Appellant's first complaint is that the Department acted in an arbitrary and capricious manner by failing to interview appellant as required under Department Directive 303.2 IV, which mandates that "[a]ll investigations will include interviews of the complainant, any known witnesses, and the officer(s) involved." [3] Appellant argues, essentially, that the Department's failure to follow its own rules and regulations deprived him of due process rights guaranteed by the directive. He contends that "[h]ad IID interviewed Cpl. Coleman, as required, neutral investigators would not have sustained administrative discipline charges against him."

The law that governs this case is the Law Enforcement Officer's Bill of Rights, Md.Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.), Art. 27, §§ 727–734D ("LEOBR"). LEOBR § 734B provides:

---

**3.** Despite the requirement of the Rules that the parties attach "[t]he citation and verbatim text of all pertinent constitutional provisions, statutes, ordinances, rules, and regulations," Md. Rule 8–504(a)(7), it appears that appellant has failed to provide this Court with a copy of Department Directive 303.2 IV. The record extract contains copies of parts of this directive, but part IV is missing. When appellant cites to the record in support of the quoted language, he cites to the hearing transcript and not to the directive itself.

Except for the administrative hearing process provided for in Article 41, § 4–201 concerning the certification enforcement power of the Police Training Commission, the provisions of this subtitle shall supersede any State, county or municipal law, ordinance, or regulation that conflicts with the provisions of this subtitle, and any local legislation shall be preempted by the subject and material of this subtitle.

*See also Moats v. City of Hagerstown,* 324 Md. 519, 527–30, 597 A.2d 972 (1991) (discussing the legislative history behind the statute and noting that it "clearly supports the position that the procedures of the [LEOBR] are exclusive"). Thus, we look to LEOBR to determine whether appellant was required to be interviewed in this case.

The procedures to be followed with respect to interrogation or investigation can be found at LEOBR § 728(b). As appellant acknowledged at oral argument, there is no requirement in the statute for a mandatory interview of the officer by independent investigators.

■■ The Department contends that "[a]ppellant, himself, testified he was 'interviewed' by detectives."[4] Appellant did not dispute that he made this statement. To the extent that this is an admission, appellant is estopped from complaining that he was not interviewed. Appellant noted at oral argument that LEOBR requires each interrogation to be recorded, LEOBR § 728(b)(8), and argued, for the first time, that this provision had been violated. This issue has not been fully briefed, and we decline to address it. Furthermore, the record is not clear, apart from appellant's admission, than an "interview" with detectives took place, and, if it did, whether that "interview" rose to the level of an interrogation.

## II.

Appellant argues that the Board conducted his disciplinary hearing at a time when he was fully disabled. Appellant

---

4. Appellant testified: "The only time I ever requested a lawyer was after I was interviewed by other detectives and they requested to go search my house."

contends that holding the hearing, in light of his disability, was in contravention of the FMLA, which does not require persons on leave to report to work. At oral argument, appellant contended that being required to attend the hearing was tantamount to being required to work. Appellant offers no cases in support of his contention that a person on FMLA leave cannot be disciplined or terminated for actions occurring prior to taking leave.

Turning first to the language of the statute, we note that the FMLA provides that an employee on FMLA leave is not entitled to anything more than what he/she was entitled to if he/she had not taken leave. 29 U.S.C. § 2614(a);[5] *see also* 29 C.F.R. § 825.216.[6] Furthermore, an employer may deny resto-

---

**5.** Section 2614 provides:

(a) Restoration to position.

(1) In general. Except as provided in subsection (b), any eligible employee who takes leave under section 102 [29 USCS § 2612] for the intended purpose of the leave shall be entitled, on return from such leave—

(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

(2) Loss of benefits. The taking of leave under section 102 [29 USCS § 2612] shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced.

(3) Limitations. Nothing in this section shall be construed to entitle any restored employee to—

(A) the accrual of any seniority or employment benefits during any period of leave; or

(B) any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.

**6.** This regulation provides:

(a) An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment. For example:

(1) If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and

ration of the employee to his former job if the employer can show that the employee "would not otherwise have been employed at the time of reinstatement." 29 C.F.R. § 825.216(a). This has been held to apply to employees terminated for disciplinary reasons. *Renaud v. Wyoming Dep't of Family Serv.*, 203 F.3d 723, 732 (10th Cir.2000) (Although employee took FMLA leave for treatment of alcoholism, disciplinary action was proper even though it resulted in appellant's termination for violating Wyoming's substance abuse policy by being intoxicated on the job.)

 Courts have allowed employees to be terminated for wrongdoing when the wrongdoing occurred, and was known of, prior to the employee taking FMLA leave. *Beno v. United Telephone Company of Florida,* 969 F.Supp. 723, 726 (M.D.Fla.1997). In *Beno,* the employee had requested reimbursement for meals for which she was not entitled to reimbursement, and, although she was on FMLA leave at the time she was fired, the decision to terminate her had been made prior to the leave. *Beno,* 969 F.Supp. at 726. *See also Carrillo v. The National Council of Churches of Christ in the U.S.A.,* 976 F.Supp. 254, 256 (S.D.N.Y.1997). In other words, "if [the employee] would have been terminated because of poor work performance regardless of whether [he or] she took leave, then [the employer] did not violate FMLA." *Hubbard v. Blue Cross Blue Shield Ass'n,* 1 F.Supp.2d 867, 875 (N.D.Ill. 1998). *See also Clay v. City of Chicago Dep't of Health,* 143 F.3d 1092, 1094 (7th Cir.1998).

---

restore the employee cease at the time the employee is laid off, provided the employer has no continuing obligations under a collective bargaining agreement or otherwise. An employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration.

(2) If a shift has been eliminated, or overtime has been decreased, an employee would not be entitled to return to work that shift or the original overtime hours upon restoration. However, if a position on, for example, a night shift has been filled by another employee, the employee is entitled to return to the same shift on which employed before taking FMLA leave.

 In this case, the integrity test occurred on December 4, 1997, and appellant was charged with disciplinary violations on December 12, 1997. Approximately four months later, on April 6, 1998, appellant was placed on FMLA leave. Although appellant was on FMLA leave at the time of his hearing, the disciplinary action was underway prior to his leave. In addition, appellant's requests for continuance were responsible for the hearing taking place at the time it did. Hearings had been scheduled for February 3, 1998, then February 9, 1998, then March 11, 1998, prior to appellant settling on April 27, 1998, as the day the hearing would take place. Therefore, appellant was at least partially responsible for the fact that the hearing occurred while he was on FMLA leave. Under these circumstances, we do not believe that proceeding with a hearing scheduled in cooperation with appellant violated the FMLA.

Insofar as appellant claims that proceeding with the scheduled hearing violated his due process rights because of his psychological condition, appellant filed no formal motions based on competency prior to the beginning of the hearing even though he was placed on FMLA leave approximately three weeks before. Moreover, he did not raise the issue of competency and the need for a further continuance until after he had already testified in connection with his motion to have Lt. Rzepkowski recuse himself for bias.

> The next motion that I have is a motion for a continuance of the matter on the basis of my client's medical condition. The Anne Arundel County Police Department contacted Dr. Philip Dvoskin, ... And required Dr. Dvoskin to make a determination whether or not my client was suffering a disability, a disabling condition which prevents him from working. That letter was sent to Dr. Dvoskin on April 6th, 1998 and Dr. Dvoskin was required to respond to the request of the Police Personnel Section, Manager Bjorn Pedersen.... The Police Department has been on notice since the response of Dr. Dvoskin that my client is disabled and cannot work, suffers impairments to concentration and is taking psychotropic medications, undergoing psychothera-

py, is under sedation, antidepressants and suffering marked depressive affects and he, he is found by the doctor to be fully disabled at this time. And obviously a fully disabled police officer should not have received a summons and an order to be present here in court and this was all accomplished by the Police Department and I'd like to mark this as a defense exhibit in support of a motion and respectfully request that this matter be adjourned until such time as my client reached medical improvement.

In denying the motion, the Board found that,

although [a document submitted concerning appellant's medical condition] does make reference to his um, abilities to perform the functions of a police officer, it does not reference specifically his ability to be here today to testify at this hearing. As a matter of fact and previously recalled on the record Corporal Coleman has already testified this morning and uh, Mr. Ahlers has described his client's testimony as competent already this morning and there is no reason for this Chairman or this Board for that matter to believe that his testimony previous was [not] competent and cannot be competent for the remainder of this Hearing.

 We believe that appellant's competency to defend himself at his administrative hearing is akin to competency to stand trial. In order to be competent to stand trial, a defendant must exhibit both the "present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as factual understanding of the proceedings against him." *Thanos v. State,* 330 Md. 77, 87, 622 A.2d 727 (1993) (quoting *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960)).

 During his testimony concerning the requested recusal of Lt. Rzepkowski, appellant answered his attorney's questions with full understanding; he remembered details that had taken place years earlier. There was no indication whatsoever that he was incapable of consulting with his lawyer or that he did not understand the proceedings against him. Appellant's later testimony likewise indicated that he was able to compre-

hend fully what was going on and to respond appropriately to questions that were asked of him by both the prosecutor and his own attorney. In short, there was nothing to give the Board any indication that appellant was not competent such that his competency should have been questioned *sua sponte*. *See Tilghman v. State,* 117 Md.App. 542, 566–67, 701 A.2d 847 (1997) (citing *Thanos,* 330 Md. at 81–87, 622 A.2d 727).

### III.

Appellant's third allegation of error is that he was denied due process of law when Lt. Rzepkowski refused to recuse himself from the hearing. This error is based both on appellant's alleged right under a collective bargaining agreement to have a peremptory challenge against the Board's membership, and on Lt. Rzepkowski's alleged bias against appellant stemming from a "complaint" Lt. Rzepkowski had filed against appellant in the past.

Appellant has not provided us with a copy of the collective bargaining agreement he claims gives him a peremptory challenge to a member of the Board. Thus, we decline to discuss appellant's arguments on that point, as we have no way of knowing what the collective bargaining agreement actually provides in regard to a peremptory challenge against the composition of a hearing board.[7]

We turn to appellant's arguments with respect to Lt. Rzepkowski's alleged bias. Appellant set out the charges Lt. Rzepkowski had previously made against him:

[O]n a prior occasion you have personally made a complaint about Corporal Charles Coleman that during that complaint process you complained that he lacked integrity and that you're now sitting as Chairperson of a Hearing Board specifically on a case where there is an integrity violation

---

7. We note that the prosecutor and the Board recognized a right to a peremptory strike that apparently was not exercised timely. As the prosecutor noted, "there was never a time he could strike. At the time he was retained by Mr. Coleman his time [to make a peremptory strike] had elapsed before he even hired Mr. Uh, Mr. Ahlers."

alleged. It seems to me that it would be virtually impossible to be objective, open minded and fair as certainly you would agree the law would require you to be when you have prejudged my client's integrity on a prior occasion and as a police official here in the Anne Arundel County Police Department caused an official investigation to be conducted against my client on the basis of integrity which is at the heart and soul of the case which you are present to hear about.

According to appellant:

I was notified by my lieutenant that I was under investigation ... in reference to a complaint by Sergeant Rzepkowski, that was a sergeant at that time in Narcotics in Eastern District TNT in reference to a complaint from Sergeant Rzepkowski that I had exposed his, his under cover identity in a uh, uh, liquor establishment that he was working and also that I had uh, failed to perform my duties as a police officer and uh, Captain Shanahan said that this was a serious investigation, serious incident, serious complaint and that he was personally investigating the complaint.

The investigation was apparently concluded in appellant's favor, as he was never formally charged in the matter.

For his part, Lt. Rzepkowski initially did not recall having made any complaints against appellant:

I'm not aware of any formal investigation or charges, or investigation of any kind that I took place in which involved uh, your client as a defendant. I recall interviewing your client as witness to a uh, independent investigation I was conducting at the time. And once again I'll deny your motions for the repeal of myself.

 After appellant testified and after appellant's counsel made further argument, Lt. Rzepkowski stated:

I am aware of the previous incident that you're referring to with Corporal Coleman. I have never formally charged Corporal Coleman with any charge. I have not interviewed Corporal Coleman as a defendant to any charge. I've never told Corporal Coleman or anyone uh, involved with the

Police Department that I thought Corporal Coleman was a man of no integrity involving the police profession. As a supervisor in charge of an investigation at the time I expressed concerns to my commander about the interpretation of what I viewed Corporal Coleman's actions in the process of my investigation as part of the uh, supervisory responsibilities and duties and consistent with the chain of command to note any complications or problems that may arise during an investigation. Those were noted. I can't comment on either his lieutenant[']s or Captain Shanahan's comments or directives to him at that time. Uh, that withstanding there is no reason at all to believe that I cannot be completely objective and unbias[ed] during this hearing process.

The Board then noted that appellant had raised no objection to Lt. Rzepkowski's bias or objectivity prior to the hearing.

"[T]here is a strong presumption in Maryland ... and elsewhere ... that judges are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified.... The recusal decision, therefore, is discretionary ... and the exercise of that discretion will not be overturned except for abuse."

*Regan v. Bd. of Chiropractic Examiners*, 355 Md. 397, 410–11, 735 A.2d 991 (1999) (quoting *Jefferson–El v. State*, 330 Md. 99, 107, 622 A.2d 737 (1993)). In order to determine whether he should recuse himself, the judge should look at the facts and the law and decide "whether a reasonable person knowing and understanding all the relevant facts would recuse the judge." *Regan*, 355 Md. at 411, 735 A.2d 991 (citations omitted).

 In this case, Lt. Rzepkowski did not initially recall filing charges against or investigating appellant. He indicated that, in the past, he had had some concerns about appellant's behavior on a particular case, but these concerns were unrelated to appellant's integrity or honesty. Moreover, any investigation was resolved to Lt. Rzepkowski's satisfaction. That Lt. Rzepkowski had questioned appellant's behavior some years

earlier did not automatically disqualify him from the Board in this case. *Regan*, 355 Md. at 413, 735 A.2d 991. We believe that a reasonable person with all of the facts would not recuse Lt. Rzepkowski. Therefore, Lt. Rzepkowski did not abuse his discretion in refusing to recuse himself.

## IV.

Appellant next argues that his rights were violated when evidence, the $71.00, was seized from his person and then used to convict him. Appellant produced the money in response to Lt. Schlein's order to him to empty his pockets. Appellant now argues that the $71.00 should be suppressed because it was not obtained pursuant to either a warrant or an exception to the warrant requirement.

It is helpful at this point to review the evidence adduced at the hearing with respect to this search, beginning with Lt. Schlein's testimony.

[Q (by the Prosecutor):] Lt. Schlein did there come a time on December 5th, 1997 that you ordered uh, Officer Coleman surrender anything he had in his pockets to your, or empty his pockets in your presence?

[A (by Lt. Schlein):] That's correct. I did.

[Q:] And did he comply with [that] order?

[A:] Yes.

[Q:] And would you tell the Board what you observed?

[A:] Uh, when I ordered Corporal Coleman to empty his pockets, he said, "It's here." And I responded by stating, "What's here?" And he replied, "All. . . . ."

[At this point, appellant's attorney objected and there was discussion with respect to that objection.]

[Q:] So after Officer Coleman stated "It's here.", would you please uh, continue in what was stated next.

[A:] Ok. I responded by stating, "What's here?" And Corporal Coleman replied, "All the money from last night, sixty-five dollars. I knew it was a set up. It was stupid of me."

[Q:] And those were Officer Coleman's words?

[A:] Yes.

[Q:] What happened next?

[A:] Uh, Corporal Coleman proceeded to pull, pull out a money clip from his uh, right front pants' pocket and he counted out seventy-one of the, the seventy-six dollars that was unaccounted for from the night, from last night, the prior night.

[Q:] And how do you know that, that was money?

[A:] Well, what happened uh, I was given a photo copy of the currency and uh, with serial numbers. What happened uh, Corporal Coleman reached across my desk and retrieved that, that photo copy of the currency and what he did, he matched physically matched the currency from his pocket with the photo copied currency. Uh, he compared the serial numbers uh, on the money he had with the serial numbers of uh, the copy. All of it matched up except for one uh, five dollar bill. And his comment was that uh, he must have spent the five dollar bill.

[Q:] Ok. And did you solicit that uh, comment? Did you ask him what happened to the five dollars?

[A:] No.

[Q:] That was an unsolicited comment?

[A:] Yes. I didn't ask any questions.

\* \* \*

[Q:] Would you just, uh, give your Board your impression of Officer Coleman's demeanor and attitude uh, during this meeting after learning of what you informed him?

[A:] He appeared to be upset but he was uh, cooperative and uh, didn't present any problems to me.

Then on cross-examination, the following exchange took place:

[Q (by defense counsel):] And you've seen different people react when they're caught. Is that correct?

[A:] Yes.

[Q:] Many people react with uh, I guess an attempt to evade apprehension or to resist the showing of evidence. Isn't that true?

[A:] Yes.

[Q:] Corporal Coleman's reaction in a sense was exactly the opposite of that. Wasn't it?

[A:] Yes.

[Q:] Wasn't he trying to show that he had the money on him?

[A:] Yes, he did. He pulled it right out of his pocket.

[Q:] I understand and then he even went a step further. He tried to take the list and match the bills. Is that correct.

[A:] Yes.

There is no indication from the foregoing testimony that appellant did not consent to emptying his pockets. There were no threats, no search of appellant's person, and no refusals. Likewise, appellant never indicated that he emptied his pockets against his will:

[Q (by defense counsel):] Did you ever resist any effort to answer any question ever put to you by anybody from the beginning of the investigation to the end?

[A (by appellant) ]: No, Sir. I did not.

\* \* \*

[Q (by the Prosecutor):] And then you get to Eastern and produce the rest of the money . . .

[A:] Uh, as . . .

[Q:] . . . onced [sic] ordered.

[A:] As, as I said I thought I had all the money the entire seventy-six dollars with me. I'm surprised when I didn't. Didn't have that particular five dollar bill.

[Q:] Did um, when you made the comment to Schlein that you knew it was a set up, could you explain what you meant by that?

[A:] When, when uh, Sergeant or Lt. Tice called me on the radio and told me to respond immediately to Eastern and then when I called him from the courthouse and he was very vague about why he wanted me to go to Eastern, I knew something was wrong. I didn't associate the two items together. I, I figured there was some complaint on me from some other type of incident. I didn't associate the one with the other and until I got to the station was notified. I even had to clarify that with Schlein when he said you were being suspended. Why, under what allegation was I being suspended for? What did [I] supposedly do? I asked him specifically and he testified to that also. I didn't even know the two incidents. So, so that's what I was talking about.

[Q:] And what was that?

[A:] That, that you know, me getting called into the station. You know, ordered to come into the station, you know after court or directly. That's what I was referring to, not to the fact that, that uh, money being turned over to me or anything. Cause if I had thought it was a setup I wouldn't of, you know I would have been very, very careful about how I handled everything.

Voluntary consent is an exception to the warrant requirement. *In re Tariq A–R–Y*, 347 Md. 484, 490–91, 701 A.2d 691 (1997), *cert. denied*, 522 U.S. 1140, 118 S.Ct. 1105, 140 L.Ed.2d 158 (1998) (citing *United States v. Matlock*, 415 U.S. 164, 165–66, 94 S.Ct. 988, 990, 39 L.Ed.2d 242, 246 (1974); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973)). Appellant was doubtless well aware of his right to refuse consent, having spent nineteen years as a police officer. This ultimately does not matter, however, as Lt. Schlein was not required to remind appellant that he could refuse consent. *Bustamonte*, 412 U.S. at 223, 93 S.Ct. at 2050. It is true that appellant was ordered by Lt. Schlein to empty his pockets, but had he refused, he would have faced only administrative sanctions:

[Lt. Schlein:] I gave him [appellant] an order and if he didn't comply uh, in all likelihood he would have been charged departmentally with failing to obey a direct order. I wouldn't have then searched him at that time.

The exclusionary rule applies only to criminal proceedings and forfeiture cases. *Sheetz v. Mayor and City Council of Baltimore*, 315 Md. 208, 212, 553 A.2d 1281 (1989). We find *Sheetz* to be particularly instructive in this case.

*Sheetz* involved searches of correctional officers leading to discharge proceedings of those officers. *Sheetz*, 315 Md. at 210–11, 553 A.2d 1281. Like appellant, the appellant in *Sheetz* argued that the evidence used against him in his administrative hearing had been seized in violation of the Fourth Amendment. *Sheetz*, 315 Md. at 211, 553 A.2d 1281. The Court of Appeals found that the exclusionary rule is inapplicable in administrative discharge proceedings unless the seizure occurred in bad faith. *Sheetz*, 315 Md. at 216, 553 A.2d 1281.

 We find that there was no bad faith or improper motive on the part of the Department or Lt. Schlein in this case. In fact, we note that Lt. Schlein testified that he had "never [had] a problem" with appellant and it was his "intent to simply read th[e] emergency suspension to him" and not to conduct any sort of investigation.

## V.

 Appellant's final argument is that, in administrative cases arising out of theft or fraud related activity, the burden of proof standard is clear and convincing. The rules used by the Board in Anne Arundel County require that the case be proved by a preponderance of the evidence, which is defined by the Trial Board Procedures Manual as 51%.

The Department argued, and the circuit court agreed, that the Board actually decided the case based on clear and convincing evidence:

The Board unanimously found Corporal Coleman **GUILTY OF ALL EIGHT CHARGES.** The Board be-

lieved Corporal Coleman was untruthful in his documentation, his rationalizations for his handling of the $76, and his testimony. Regardless of Corporal Coleman's handling of the $76 from a procedural perspective, he *clearly convinced* the Board of his intent to steal when he took the $76 from his shirt pocket, mixed the recovered money with his own, and spent $5 of the recovered money.

The determination that Corporal Coleman had intended to steal the $76 enabled the Board to *clearly* reach guilty verdicts on Charges One, Three, Four, Five, Seven, and Eight. Corporal Coleman admitted to Charge Two, and so was found guilty. As to Charge Six, the Board did not buy Corporal Coleman's reasoning regarding the words American Currency representing the $76. Combined with the Incident Report inaccuracies and incomplete nature. [T]he Board clearly found that Corporal Coleman had not prepared a Recovered Property for the $76. (Bold in original, underlined emphasis added).

Despite the use of the words "clearly" and "clearly convinced," it is difficult to ignore the Board's prior recognition of the required standard of proof being a preponderance of the evidence:

[By the prosecutor:] Keep in mind for the purpose of this hearing that we're dealing with preponderance of evidence issues.

[By appellant's counsel:] Objection.

[By the prosecutor:] It's not a reasonable doubt of . . .

[By Lt. Rzepkowski:] Over ruled.

[By the prosecutor:] It's not a reasonable doubt standard and all we have to do is present fifty-one percent, just fifty-one percent of the evidence. One . . .

[At this point, appellant's counsel objected again and argued that the appropriate standard of proof was clear and convincing evidence. The prosecutor objected, and Lt. Rzepkowski then stated:] We have, we have three police officers up here. We're not lawyers. We're not judges. Um, we don't study or practice on a regular daily basis uh, the case uh pertaining to the issues of which you have addressed.

> Certainly, you've go[t] them on the record. They're there for appellate review should they come up. I understand the um, the preponderance rules. This is a civil proceeding. Um, I will sustain your objections as far as um, uh, Lt. Snow's [the prosecutor's] further elaboration during his opening statement on that issue about the preponderance rule. The Board is aware of the weight of the evidence in this hearing.

Despite the language used in its report to the Chief, we cannot conclude that the Board actually decided the case using the clear and convincing standard, and we decline to decide the case on this ground.

 An administrative case is a civil case and, as such, the standard of proof is generally the preponderance of the evidence. *See* Md.Code (1984, 1999 Repl.Vol.), § 10–217 of the State Government Article ("The standard of proof in a contested case shall be the preponderance of the evidence unless the standard of clear and convincing evidence is imposed on the agency by regulation, statute, or constitution.") Nevertheless, in some instances, proof of a case by clear and convincing evidence may be more appropriate "because of the seriousness of the allegations." *Everett v. Baltimore Gas & Elec.*, 307 Md. 286, 301, 513 A.2d 882 (1986). The burden of proof in civil cases involving fraud, for example, have long been subject to the clear and convincing standard. *Meyers v. Montgomery County Police*, 96 Md.App. 668, 693, 626 A.2d 1010 (1993).

Despite the foregoing, this Court in *Meyers* declined to require the clear and convincing evidence standard in cases conducted under LEOBR. *Meyers,* 96 Md.App. at 694, 626 A.2d 1010.

The *Meyers* Court looked at prior cases discussing the situations in which the higher standard would be appropriate and stated:

> We believe that *Rent–A–Car Co. [v. Globe & Rutgers Fire Ins. Co.,* 161 Md. 249, 156 A. 847 (1931)] and *First Nat'l Bank of S. Md. [v. U.S.F. & G. Co.,* 275 Md. 400, 340 A.2d 275 (1975)] merely stand for the proposition that while the clear and convincing standard must be applied in a civil

proceeding in which fraud, dishonesty, or criminal conduct is alleged, this requirement does not automatically extend to administrative proceedings.

*Meyers,* 96 Md.App. at 695, 626 A.2d 1010. The *Meyers* Court then stated that, notwithstanding the Court of Appeals' decision in *Everett* to require that the case be proved by clear and convincing evidence, it believed the *Everett* decision to be closely limited to the facts of that case. *Meyers,* 96 Md.App. at 696, 626 A.2d 1010. The Court then went on to cite cases from a number of other jurisdictions upholding the use of the preponderance of evidence standard in administrative proceedings:

> Our review of the contemporary case law of our sister states addressing similar questions supports our view. *Board of Education of City of Chicago v. State Board of Education,* 113 Ill.2d 173, 100 Ill.Dec. 715, 720–24, 497 N.E.2d 984, 989–93 (1986) (proper standard of proof applicable to tenured-teacher dismissal proceedings, including those where conduct that might constitute crime is charged, is preponderance of the evidence standard); *In the Matter of D'Angelo,* 105 N.M. 391, 733 P.2d 360, 361–62 (1986) (in attorney disciplinary proceeding, standard of proof in administrative hearing is preponderance of the evidence, absent allegation of fraud or statute or court rule requiring higher standard); *Jordan v. Roberts,* 161 W.Va. 750, 246 S.E.2d 259, 262 (1978) (unless altered by statute, in administrative hearing before motor vehicle commissioner considering suspension of operator's permit for refusing to submit to breathalyzer, the general rule is that required degree of proof is preponderance of the evidence); *Pelling v. Illinois Racing Board,* 214 Ill.App.3d 675, 158 Ill.Dec. 322, 325–26, 574 N.E.2d 116, 119–20 (1991) (preponderance of the evidence, rather than clear and convincing evidence standard, applied to a proceeding before the Racing Board in which a race horse driver was charged with unsatisfactory driving).

*Meyers,* 96 Md.App. at 696–97, 626 A.2d 1010.

We agree that most, if not all, of the charges in this case would fit within the "fraud, dishonesty, or criminal conduct"

category requiring a higher standard of proof in civil cases. *Meyers,* 96 Md.App. at 695, 626 A.2d 1010. We point out that the appellant's actions in *Meyers* also amounted to criminal conduct in that he was accused of use of excessive force for "hit[ting]/beat[ing] Mohammed Givpour with your portable radio before and after he had been handcuffed and lying on the ground in the parking lot" and for "kick[ing] and stomp[ing] Mohammed Givpour with your foot while Mr. Givpour was lying on the ground handcuffed." *Meyers,* 96 Md.App. at 687, 626 A.2d 1010. As did the appellant in *Meyers,* appellant here relies heavily on *Everett* in arguing that the clear and convincing standard is the appropriate standard in this case. Appellant's argument, in essence, is that there is a sufficient difference between criminal conduct such as assault and criminal conduct involving dishonesty, fraud, and theft related offenses to warrant a different result than in *Meyers.* We are not persuaded. Although the Court in *Meyers* was confronted with an assault by a policeman, rather than dishonesty, the Court referred to criminal conduct generally in determining the appropriate burden of proof. The fact that the conduct may be criminal in another setting did not require use of the clear and convincing standard in an administrative action. *Meyers,* 96 Md.App. at 703, 705–06, 626 A.2d 1010.

In *Meyers,* the inquiry was centered around the balancing test contained in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Meyers,* 96 Md.App. at 697, 626 A.2d 1010 (quoting *Mathews,* 424 U.S. at 334–35, 96 S.Ct. at 903). The Supreme Court has used this test to determine whether a particular standard of proof is constitutionally adequate. *Meyers,* 96 Md.App. at 700, 626 A.2d 1010 (citing *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). We will conduct the same inquiry.

The "private interest that will be affected by the official action" in the present case is appellant's continued employment and protection of his pension. In *Meyers,* this was not enough because employment in the police department in that case, as in this case, was not covered by a tenure provision. *Meyers,* 96 Md.App. at 701, 626 A.2d 1010. In other words, there was no protected property right to continued employment. *Meyers,* 96 Md.App. at 701, 626 A.2d 1010. Likewise, the *Meyers* Court found that an individual's rights in his reputation and honor do not rise to the level of a protected liberty interest. *Meyers,* 96 Md.App. at 701, 626 A.2d 1010. Because of the timing of the integrity test, appellant's retirement benefits were adversely affected. On the other hand, he had no vested interest in those rights at the time of the hearing.

With respect to the second prong of the *Mathews* test, we must look at "the risk of an erroneous deprivation of [appellant's] interest through the proceedings used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903. Appellant argues that being only 51% sure that appellant violated the rules is insufficient to support the punishment he received in this case. At oral argument, appellant analogized his punishment, which resulted in a loss of his retirement, to criminal sanctions. In *Meyers,* the appellant pointed out various indicia present in both LEOBR hearings and in criminal trials in arguing that changes would be relatively easy to implement. Moreover, he complained about the disparity of resources of the county versus his limited resources to defend himself, a situation that also exists in

criminal cases. *Meyers,* 96 Md.App. at 702–03, 626 A.2d 1010. The Court found this to be insufficient however:

> We agree with Officer Meyers that the LEOBR proceedings have some indicia of a criminal trial. Nevertheless, we must not lose sight of the fact that they are, in reality, administrative proceedings conducted by laypersons. *See Widomski v. Chief of Police of Baltimore County,* 41 Md. App. 361, 380, 397 A.2d 222, cert. denied, 284 Md. 750 (1979). This Court has stated, "Nothing in section 730 requires, or suggests for that matter, that it is the equivalent of a criminal proceeding" *Id.* 41 Md.App. at 379, 397 A.2d 222. In *Widomski,* this Court refused to require a hearing board constituted under the LEOBR to "adhere strictly to the rules of criminal procedure." *Id.* at 380, 397 A.2d 222. Nor do we believe that a finding of "guilty" or "not guilty" or the imposition of "punishment" transforms the LEOBR proceedings into a criminal or quasi-criminal trial. The LEOBR proceedings are disciplinary in nature and this results in the labels placed on the findings of a hearing board.
>
> Furthermore, although the LEOBR sets forth certain evidentiary guidelines, "administrative agencies are not generally bound by the technical common-law rules of evidence...." *Montgomery County v. National Capital Realty Corp.,* 267 Md. 364, 376, 297 A.2d 675 (1972). Administrative agencies must simply "observe the basic rules of fairness as to parties appearing before them. Thus, even hearsay evidence may be admitted in contested administrative proceedings." *Id. See, e.g., Maryland Dep't of Human Resources v. Bo Peep Day Nursery,* 317 Md. 573, 595, 565 A.2d 1015 (1989) ("procedural due process does not prevent an agency from supporting its decision wholly by hearsay, if there is underlying reliability and probative value"), *cert. denied sub nom. Cassilly v. Maryland Dep't of Human Resources,* 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990).
>
> Furthermore, § 731(a) actually gives the officer greater protection than that afforded to a criminal defendant be-

cause the decision of the Board must be in writing and accompanied by findings of fact. A criminal defendant may be convicted of the crime with which he or she is charged and, if tried by a jury, the defendant only sees the verdict sheet and hears the jury foreperson pronounce the finding of guilt or innocence. The verdict sheet is not accompanied by findings of fact. In a bench trial, the judge may simply orally rule from the bench that the defendant is guilty and not state any reasons for his or her ruling. Other than the entry on the docket sheet, the defendant is not assured of receiving a decision or order from the trial court.

Nor are we persuaded by Officer Meyers's argument that the County's ability to assemble a case dwarfs his ability to present a defense. The concerns raised by the Supreme Court in *Santosky,* supra, included: (1) the unusual discretion of the court to "underweigh probative facts that might favor the parent," 455 U.S. at 762, 102 S.Ct. at 1399; (2) the State's attorney's access to all public records concerning the family; (3) the State's ability to call expert witnesses; (4) the fact that the State's primary witnesses would be its own caseworkers "whom the State has empowered both to investigate the family situation and to testify against the parents," *id.* at 763, 102 S.Ct. at 1400; and (5) the State's "power to shape the historical events that form the basis for termination" of the parents' rights, *id.* at 763, 102 S.Ct. at 1400. Such concerns are not present in the case before us. As previously discussed, the LEOBR provides a police officer with extensive procedural safeguards. The preponderance of the evidence standard, thus, properly allocates the burden between the County and Officer Meyers.

*Meyers,* 96 Md.App. at 703–05, 626 A.2d 1010.

Finally, with respect to the last part of the *Mathews* test, including the government's burden and any additional burden that the heightened burden of proof would entail, the *Meyers* Court recognized that the County and the police department's burden would be limited. *Meyers,* 96 Md.App. at 705, 626 A.2d 1010. Nevertheless, the Court found the Department's "interest in the internal discipline of the Police Department"

weighed "heavily in their favor," concluding that the preponderance of the evidence standard was the appropriate burden of proof in LEOBR proceedings. *Meyers,* 96 Md.App. at 705, 626 A.2d 1010.

 While appellant's situation, most especially his loss of his pension, may tip the scales more in favor of a heightened burden of proof than did the situation in *Meyers,* we believe *Meyers* to be controlling. We decline to require police hearing boards to apply different standards of proof in different cases depending upon the charges that are brought against an officer.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**